## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JULIA ANNA WRIGHT,**

      **Plaintiff,**

**v.**                                                    **Case No.: 2:16-cv-02053**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 12 & 13).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the

extent that it requests remand of the Commissioner's decision, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.    <u>Procedural History</u>

On November 27, 2012, Plaintiff Julia Anna Wright ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of January 15, 2012, (Tr. at 212-23), due to "carpal tunnel and rheumatoid arthritis," (Tr. at 254). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 138-47, 150-55). Claimant filed a request for an administrative hearing, (Tr. at 156-57), which was initially held on October 30, 2014, before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 81-104). By written decision dated November 19, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 63-80). The ALJ's decision became the final decision of the Commissioner on January 9, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Memorandum in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13). The allotted time period for Claimant to file a reply brief has expired. Consequently, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 43 years old on her alleged onset date and 46 years old on the date of the ALJ's decision. (Tr. at 73). She has a ninth grade education and communicates in English. (Tr. at 253, 255). She completed training as a certified nursing assistant in 2000 and previously worked as a cashier/food preparer at a fast food restaurant and as a dining room attendant at a restaurant. (Tr. at 255).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third,

after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2017. (Tr. at 68, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 15, 2012, the alleged disability onset

date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "carpal tunnel syndrome and asthma." (Tr. at 68-69, Finding No. 3). The ALJ also considered Claimant's acute yeast infections, well-healed stab wound to the left scapula area, uterine fibroids with menometrorrhagia that resolved post hysterectomy, acute episode of right lower extremity sciatica, and anemia successfully treated with iron tablets, but found that those impairments were non-severe. (Tr. at 68). The ALJ also noted Claimant's mental health treatment and diagnoses of depressive disorder NOS and anxiety disorder NOS, but determined that treatment yielded a therapeutic response and found that Claimant had no severe mental impairments. (Tr. at 69). Finally, the ALJ stated that although Claimant initially alleged disability due to rheumatoid arthritis, her testing and consultative examination were negative for the condition. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 69-70, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Climbing of ladders, ropes and scaffolds is limited to occasional and other postural activities are limited to frequently. The claimant is able to handle and finger with both hands no more than frequently. There should be no concentrated exposure to dusts, fumes, gases, poor ventilation, noxious odors or other lung irritants.

(Tr. at 70-73, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 73, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful

activity. (Tr. at 73-74, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual on the alleged disability onset date; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules support a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 73, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a ticket taker, sorter, and customer service worker at the unskilled, light exertional level. (Tr. at 73-74, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 74, Finding No. 11). The ALJ also noted that Claimant's history of substance abuse for which she sustained full remission was not a contributing factor material to the determination of disability. (*Id.*, Finding No. 12).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises a single challenge to the Commissioner's decision. She contends that the ALJ committed reversible error by failing to apply the "special technique" for evaluating mental impairments set forth in 20 C.F.R. §§ 404.1520a and 416.920a to fully assess Claimant's "daily activities, ability to function socially [] in the workplace, or ability to maintain attention and concentration at step two or at any subsequent step of the sequential process." (ECF No. 12 at 9). Claimant states that the error is not harmless because even if the ALJ would have found Claimant's mental impairments to be non-severe after applying the special technique, the ALJ was required to consider the combined effect of all of Claimant's medically determinable impairments on her RFC.

In response, the Commissioner states that the "substantial evidence" standard of review is highly deferential to the Commissioner's decision and that, in this case, substantial evidence supports the ALJ's step two analysis. (ECF No. 13 at 5-13). The Commissioner argues that the ALJ discussed elsewhere in the decision Claimant's daily activities, social functioning, and the fact that Claimant did not need reminders to go places; also, the Commissioner notes that the record did not contain any evidence of episodes of decompensation. (*Id.* at 9). Therefore, the Commissioner posits that the ALJ articulated sufficient reasons, supported by the record, for finding that Claimant did not have a severe mental condition. *(Id.).* Overall, given the specifics of this case, the Commissioner contends that the ALJ's failure to insert the specific "special technique" language in the decision is harmless error because the result would clearly be the same; therefore, the Commissioner argues that it would waste resources to remand this action for further review.

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A.  Treatment Records

Claimant's treatment records from June 2011, August 2012, and June 2013 do not reflect any psychiatric complaints or issues. (Tr. 338-42, 372-74). Claimant's first record of mental health treatment is on October 23, 2013 when Claimant presented to Prestera Centers for Mental Health ("Prestera"). (Tr. at 478). On that date, Claimant underwent a non-physician mental health assessment by Tamika Pugh, B.A. *(Id.).* Claimant stated that she was unable to work due to her physical ailments and it caused depressive symptoms.

*(Id.).* She described being more withdrawn than usual and having sleep issues, depressive thoughts, loss of motivation, hopelessness, thoughts of "want[ing] to die," panic attacks around crowds and when worrying about how to pay her bills and survive, and fear of heights. *(Id.).* She stated that her presenting problems began in February 2013 and started to worsen in the "past couple of months." (Tr. at 479). Claimant denied any history of mental health treatment or psychotropic medications. *(Id.).* She stated that she lacked motivation to do anything and would not babysit her grandchildren because of her medical problems and mood irritability. *(Id.).*

The record of Claimant's initial visit indicates that her appearance was disheveled, sociability was isolated, speech was rapid, thought content was abnormal, coping skills were deficient, affect was flat, and she had suicidal ideation. (Tr. at 479-81). However, Claimant was oriented to person, place, situation, and time and had normal memory recall; appropriate eye contact; normal motor activity; good, but increased appetite; and no hallucinations or homicidal thoughts. (Tr. at 480-81). Claimant was diagnosed with depressive disorder not otherwise specified ("NOS") and anxiety disorder NOS. (Tr. at 481). She was assessed to have a Global Assessment of Functioning ("GAF") score of 55.[1] (Tr. at 482). She was scheduled for an outpatient therapy session the following month and a psychiatric evaluation in December.

On November 19, 2013, Claimant had her first one-hour individual therapy session

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

with a supervised psychologist, Melinda Henline. (Tr. at 483). Claimant stated that she wanted to "try and figure out what's going on" with her. *(Id.).* She reported that she used to be a "people person," but now had nothing to do, had no life, and could not lift her grandchildren because of her health problems. *(Id.).* She stated that she felt "like a nobody" because she could not work and became isolated, which contributed to her depression. *(Id.).* She expressed irritation with her children who asked her to babysit her grandchildren "all the time" because she was not working. *(Id.).* The treatment plan was to continue processing Claimant's thoughts and feelings and begin addressing her anxiety issues. *(Id.).*

On December 6, 2013, Claimant had another individual therapy session with Ms. Henline. (Tr. at 484). Claimant reported that she was "basically the same" except that she was watching her grandson at least five days per week. *(Id.).* She expressed frustration with her son for wanting her to watch her grandson all of the time, which caused her arm to ache and "[wore her] out." *(Id.).* Claimant was encouraged to be more assertive and the plan was to continue working on her assertiveness skills and have a follow up therapy session in January 2013. *(Id.).*

On December 19, 2013, Claimant was evaluated by Parrish Harless, APRN, at Prestera. (Tr. at 490). Her appearance was appropriate, eye contact was within normal limits; attitude was cooperative and pleasant; speech was normal; affect and thought content were appropriate; thought processes were goal-directed; memory was intact; and she was alert and oriented to time, person, place, and situation; she also had no suicidal or homicidal thoughts or hallucinations. (Tr. at 490-91). However, she reported issues with depression and anxiety; her motor activity was increased and restless; her concentration, calculation, and judgment were impaired; her intelligence was estimated

to be below average; and her insight was limited. (Tr. at 491-92). Her diagnosis remained depressive disorder NOS and anxiety disorder NOS, and her GAF score was still 55. (Tr. at 492-93). Claimant's prognosis was guarded. *(Id.).* She was prescribed Celexa for depression and anxiety and Buspar for anxiety attacks. (Tr. at 494).

Claimant had a third individual therapy session with Ms. Henline on January 6, 2014. (Tr. at 485). She stated that she had not "been that depressed really," but was angry with her son regarding having to watch her grandson so much of the time. *(Id.).* She stated that her grandson's mother was "getting out of prison soon" and she was concerned how that would affect everyone. *(Id.).* She was "starting to get stronger" and her mood was better. *(Id.).* The plan was to continue working on reducing her depressive symptoms. *(Id.).*

On January 15, 2014, Claimant began seeing Mark Richards, M.D., at Thomas Health System Physician Partners Healthscope Family Practice. (Tr. at 468). She noted that she had been "feeling tired" and had depression and anxiety, which was treated at Prestera Center. *(Id.).* Yet, her records from that visit noted that she denied anxiety, depression, difficulty sleeping, compulsive behaviors, or being withdrawn. (Tr. at 470).

On January 29, 2014, Claimant followed up with Nurse Harless at Prestera for medication management. (Tr. at 526). Claimant reported that she could not take her mental health medications because they made her sick; nonetheless, she stated that she no longer thought that she was depressed and felt like she was only battling anxiety. *(Id.).* She no longer had to babysit and believed that helped her symptoms. *(Id.).* Her mental status examination was normal. (Tr. at 526-27). Her GAF score remained 55. (Tr. at 528). Claimant's medication Celexa was discontinued and it was recommended that Claimant try Buspar on its own. *(Id.).*

On February 10, 2014, Claimant again saw Ms. Henline for individual therapy. (Tr. at 486). Regarding her symptoms and functioning, Claimant stated, "[s]o far, so good." *(Id.).* She reported beginning physical therapy and trying to not "let things get to [her]." *(Id.).* Claimant noted that her daughter had lost custody of her children; Claimant attempted to help care for one of the children, but it was "too much." *(Id.).* The plan was for Claimant to return for a therapy session later that month and continue processing her thoughts and feelings. *(Id.).*

On February 26, 2014, Claimant saw her primary care provider, Dr. Richards, for a check-up. (Tr. at 581). She admitted having anxiety, but denied other psychiatric issues and was alert, oriented, and in no acute distress. (Tr. at 583).

On February 27, 2014, Claimant again saw Ms. Henline for individual therapy. She reported that her mood had been "good" and that Buspar was helping her remain calm. (Tr. at 487). The session focused on Claimant's anxiety related to elevators, crowds, stairs, riding in the back of a two-door car and the element of being "trapped." *(Id.).* Claimant was encouraged to work on deep breathing and increase exposure to feared stimuli. *(Id.).* On that date, Claimant also saw Nurse Harless for medication management. (Tr. at 530). She reported that the medication calmed her down, but that she experienced side effects such as drowsiness and occasional feeling of a "spring snapping in [her] brain." *(Id.).* Her mental status examination was normal. (Tr. at 530-31). Her GAF score remained to be 55. (Tr. at 532). The plan was to continue Claimant's Buspar prescription because it was effective. Nurse Harless felt that the minor side effects would improve with continued use. *(Id.).*

On March 14, 2014, Claimant saw Dr. Richards for the purpose of finding a physical therapist that was in closer proximity to her. (Tr. at 578). She reported feeling "stressed

out because her daughter locked up her grandson" and feeling "numb and high." *(Id.).* However, she denied psychiatric problems and was alert, oriented, and in no acute distress. (Tr. at 579).

On March 24, 2014, Claimant had a therapy session with Ms. Henline and reported that she attempted the suggested exercises in which she imagined being in an elevator and tried to stay calm, but she began breathing heavy. (Tr. at 488). She expressed that she did not want to continue to working on that issue. *(Id.).* She reported that she was "not sure what else there [was] to work on" except for her concern regarding how her daughter parents her grandson. *(Id.).* The therapist encouraged Claimant to recognize what she cannot control and recommended that Claimant attend a stress reduction group beginning in May 2014. *(Id.).*

The following month, on April 14, 2014, Claimant had another session with Ms. Henline. (Tr. at 489). Claimant reported avoiding contact with others and having a nasty mood, but that there was "nothing really bothering [her]" and she was less depressed. *(Id.).* She expressed issues with her temper and was encouraged to use dialectical behavior therapy (DBT) techniques to control overwhelming emotions. *(Id.).* Later that month, Claimant saw Dr. Richards for physical complaints. (Tr. at 571). She reported anxiety and difficulty sleeping, but denied depression, compulsive behaviors, or being withdrawn. (Tr. at 573).

On May 8, 2014, Claimant again saw Ms. Henline. (Tr. at 606). She reported that her "mood's been ok." *(Id.).* It was decided that while she found therapy somewhat helpful, she did not have "anything that she felt needed changing at [that] time." *(Id.).* Therefore, Claimant opted to discontinue therapy. *(Id.).* Claimant also saw Nurse Harless for medication management on that date. (Tr. at 607). She reported that Buspar eased

her anxiety and that the side effect of "brain zaps" did not happen every time and were not so upsetting that she wanted to stop the medication. *(Id.).* She said she was "doing all right," but largely kept to herself and felt ill a lot due to medical issues. *(Id.).* She was not sure if she was depressed or "just sick." *(Id.).* Her mental status examination was normal other than reported occasional anxiety. (Tr. at 607-08). Claimant's Buspar was continued and Nurse Harless discussed revisiting depression medication, but Claimant denied needing medical intervention for depression, stating that she did not see herself as depressed. (Tr. at 609).

On May 29, 2014, Claimant saw Dr. Richard's for check-up. (Tr. at 565). She reported that her depression and anxiety were well-controlled. *(Id.).* At that visit, she admitted having anxiety, but denied depression, difficulty sleeping, compulsive behaviors, or being withdrawn. (Tr. at 567). She was alert, oriented, in no acute distress and had normal mood, appropriate affect, and no homicidal or suicidal ideation. (Tr. at 567-68).

On July 3, 2014, Claimant followed up with Nurse Harless for medication management. (Tr. at 611). Claimant reported that she had "some moments," but her Buspar "calm[ed] [her] down." *(Id.).* She had some sleep issues, but her mood was "pretty good" and she thought she was "more bored than depressed." *(Id.).* She noted that she stayed home a lot because there was nothing to do. *(Id.).* Her mental status examination was normal. (Tr. at 611-12). Therefore, her Buspar was continued, as it was effective in treating her anxiety and anger issues and she was also prescribed trazodone to aid with sleep issues. (Tr. at 613).

On July 17, 2014, Claimant saw Dr. Richards for physical issues; she noted that she was still treating with Prestera Center for depression, but she denied psychiatric issues

14

during her visit. (Tr. at 562-63). She saw Dr. Richards again on October 2, 2014 and reported anxiety, depression, and difficulty sleeping, but denied compulsive behaviors or being withdrawn; she was alert, oriented, and in no acute distress. (Tr. at 618-19). On November 13, 2014, Claimant had another follow-up visit with Dr. Richards and she again had no psychiatric issues and was alert, oriented, and in no acute distress. (Tr. at 656). At her next visit with Dr. Richards, on March 16, 2015, Claimant reported difficulty sleeping, but denied anxiety, depression, compulsive behaviors, or being withdrawn. (Tr. at 51). Thereafter, on February 2, 2015, Claimant did not assert any psychiatric complaints during her appointment with Dr. Richards; she denied having any anxiety, depression, difficulty sleeping, compulsive behaviors, or being withdrawn; and no psychotropic medications were listed. (Tr. at 45-48).

On May 20, 2015, Claimant presented to the emergency room with respiratory complaints. (Tr. at 12). She denied depression or mental issues and had normal mood and affect. (Tr. at 15, 34). Shortly thereafter, on May 28, 2015, Claimant followed up with her primary care provider. (Tr. at 53). At that time, she reported anxiety and difficulty sleeping, but denied depression, compulsive behaviors, or being withdrawn. (Tr. at 55).

Finally, at follow up visits with her primary care provider in June 2015 and February 2016, Claimant did not express any mental health issues. On June 16, 2015, Claimant did not have anxiety, depression, or difficulty sleeping. (Tr. at 59). On February 2, 2016, she did not present any psychiatric complaints; denied having any anxiety, depression, difficulty sleeping, compulsive behaviors, or being withdrawn; and no psychotropic medications were listed. (Tr. at 45-48).

### B. Evaluations and Opinions

On March 6, 2013, Nilima Bhirud, M.D., evaluated Claimant for the West Virginia

Disability Determination Service. (Tr. at 365-67). As far as social history, Dr. Bhirud noted that Claimant had a history of smoking one-half pack of cigarettes per day for the past 20 years, drank one to two beers per day, and abused cocaine for 20 years, but quit three years prior. (Tr. at 366). Claimant did not have any consultative mental health evaluations relating to her DIB and SSI claims.

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant contends that the ALJ committed reversible error by failing to apply the

"special technique" for evaluating mental impairments, set forth in 20 C.F.R. §§ 404.1520a, 416.920a, in order to fully assess Claimant's "daily activities, ability to function socially [] in the workplace, or ability to maintain attention and concentration at step two or at any subsequent step of the sequential process." (ECF No. 12 at 9). She further states that the error is not harmless, because even if the ALJ would have found Claimant's mental impairments to be non-severe under the special technique, the ALJ was required to consider the combined effect of all of Claimant's medically determinable impairments on her RFC. *(Id.).*

"Mental impairments require a distinct analysis under Social Security regulations." *Gunnoe v. Colvin*, No. 2:15-CV-12145, 2016 WL 5346956, at *3 (S.D.W. Va. Sept. 23, 2016) (citing 20 C.F.R. § 404.1569a). In order to assess the severity of mental impairments at the second step of the sequential process, the ALJ must use a "special technique." *Id.* Under this technique, the ALJ first determines if the claimant has a medically determinable mental impairment and then, if one exists, the ALJ documents his or her findings and rates the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(a)-(c), 416.920a(a)-(c). After rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation; a rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d), 416.920a(d). Regardless of whether the mental impairments are determined to be severe or non-severe at step two, they must be

considered in the ALJ's determination of the claimant's RFC. *Gunnoe*, 2016 WL 5346956, at *3.

In order to trigger the special technique, a claimant must present a colorable claim of mental impairment. *Gunnoe,* 2016 WL 5346956, at *3 (citing *Sesberry v. Astrue,* No. 3:08-cv-989-J-TEM, 2010 WL 653890, at *3 (M.D. Fla. Feb. 18, 2010)). "A colorable claim has been defined as one 'which is not wholly insubstantial, immaterial, or frivolous.'" *Huffman v. Colvin*, No. 1:10CV537, 2013 WL 4431964, at *7 (M.D.N.C. Aug. 14, 2013) (quoting *Dykstra v. Barnhart,* 94 Fed. App'x 449, 450 (9th Cir. 2004)). The claimant satisfies his burden to demonstrate a colorable claim by producing "medically acceptable clinical and laboratory diagnostic techniques" showing a psychological abnormality. *Sesberry,* 2010 WL 653890, at *4 (quoting 20 C.F.R. § 404.1508). "Furthermore, the impairment 'must be established by medical evidence consisting of signs, symptoms and laboratory findings, not only by [the claimant's] statement of symptoms.'" *Id.*

At step two of the analysis, the ALJ acknowledged Claimant's treatment at Prestera and accepted that Claimant had medically determinable impairments of depression and anxiety disorder. (Tr. at 69). *See, also, Sturdivant v. Astrue*, No. 7:11-CV-53-D, 2012 WL 642541, at *4 (E.D.N.C. Feb. 1, 2012), *report and recommendation adopted,* No. 7:11-CV-53-D, 2012 WL 641556 (E.D.N.C. Feb. 28, 2012) (The ALJ's "the finding that the depression was not severe presumes it to be an impairment."). The ALJ discussed Claimant's mental health treatment and the fact that it "yielded a therapeutic response," concluding that Claimant's impairments were "not severe [under] 20 C.F.R. §§ 404.1520 (a) and (c) and 416.920(a) and (c) and SSR 96-3p in that they cause no more than minimally vocationally relevant limitations." (*Id.*). However, the ALJ did not apply the

special technique outlined in 20 C.F.R. §§ 404.1520a and 416.920a.

The Commissioner argues that the ALJ's failure to apply the special technique constitutes harmless error because the ALJ discussed later in the decision Claimant's daily activities, social functioning, and the fact that Claimant did not need reminders to go places; also, the record did not contain any evidence of episodes of decompensation. (ECF No. 13 at 9). Therefore, the Commissioner argues that the ALJ articulated sufficient reasons, supported by the record, for finding that Claimant did not have a severe mental condition, and the ALJ's failure to insert the specific "special technique" language in the decision was harmless error given that the result would clearly be the same. (*Id.*).

The United States Court of Appeals for the Fourth Circuit has not explicitly adopted the "harmless error" analysis in the context of an ALJ's failure to apply the special technique for mental impairments. However, several other circuits and at least one district court in the fourth circuit have applied it in such a context. *See Pepper v. Colvin*, 712 F.3d 351, 365-67 (7th Cir. 2013) (applying harmless error analysis to ALJ's failure to "explicitly apply" special technique); *Lazore v. Astrue*, 443 F. App'x 650, 653 (2d Cir. 2011) (holding that failure to expressly discuss each of the four functional categories provided in 20 C.F.R. § 404.1520a(c)(4) was harmless where ALJ otherwise discussed claimant's mental limitations); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657 (6th Cir. 2009) (holding that harmless error analysis applies to ALJ's failure to follow special technique); *Teaster v. Colvin,* No. 1:13CV253–RJC–DSC, 2014 WL 2712442, at *3 (W.D.N.C. May 14, 2014) ("The undersigned concludes that any failure to discuss mental impairments or use the PRT at step two of the sequential evaluation is harmless when the ALJ proceeds to evaluate Plaintiff's mental impairments at a subsequent step.")

19

In contrast, the Ninth Circuit Court of Appeals and at least one district court in the fourth circuit have held that where a Plaintiff presented a colorable claim of a mental impairment, failure to follow the special technique was not harmless error. *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011); *Bartz v. Colvin*, No. 5:13-CV-112-FL, 2014 WL 1614709, at *5 (E.D.N.C. Apr. 22, 2014). As noted in *Bartz, supra*, an erroneous finding at step two of the analysis usually infects the entire decision, since all of a claimant's impairments must be considered in combination at steps three, four, and five. *Bartz*, 2014 WL 1614709, at *5 (citing *Sparrow v. Astrue,* 4:09–CV–143–D, 2010 WL 2910013 (E.D.N.C. June 28, 2010), *report and recommendation adopted,* 4:09–CV–143–D, 2010 WL 2893607 (E.D.N.C. July 23, 2010)).

Even assuming that the harmless error doctrine is applicable to an ALJ's failure to apply the special technique, the ALJ's error in this case cannot be considered harmless given the absence of any analysis in the written decision demonstrating that the ALJ considered and evaluated the functional effects of Claimant's mental impairments at any subsequent step of the process. *See, e.g., Rouse v. Colvin*, No. 1:14CV359, 2015 WL 4557406, at *5 (M.D.N.C. July 28, 2015) (An ALJ's failure to conduct requisite step two analysis can be considered harmless if the ALJ sufficiently evaluated the claimant's mental impairments at a subsequent step); *see also Cooper v. Com'r, Soc. Sec. Admin.*, No. CIV. SAG-13-3636, 2014 WL 5293686, at *3 (D. Md. Oct. 14, 2014) ("Because the ALJ considered whether [the claimant's] depressive disorder impacted her capacity to engage in basic work-related activities at Step Four, any error at Step Two would be harmless."). As the Commissioner points out, the ALJ did consider Claimant's activities of daily living when determining her RFC. He also noted that Claimant maintained contact with others by telephone, and she admitted that her problem with managing finances was due to lack

of income, not cognitive difficulties. (Tr. at 72). However, these references to Claimant's activities of daily living and social functioning do not substitute for the more focused analysis of the functional categories that is required by the special technique. Moreover, it appears from the tenor of the ALJ's discussion that the references to Claimant's activities were part of a credibility analysis, rather than an assessment of her mental functional limitations. Thus, the ALJ's error at step two was compounded by the fact that the ALJ failed to consider Claimant's mental impairments in assessing her RFC or at any subsequent step of the sequential evaluation. Indeed, the ALJ does not explicitly reference Claimant's depression and anxiety after the ALJ concluded, without applying the special technique, that Claimant's mental impairments were not severe.

The record demonstrates that Claimant was diagnosed during the relevant period with depressive disorder NOS and anxiety disorder NOS and assessed on multiple occasions to have a GAF score of 55, signifying moderate symptoms or functional difficulties. Over the course of months, she received individual therapy and medication management. She often expressed being isolated and avoiding contact with others. While Claimant did not cite her mental impairments as a cause of her alleged disability, and there are records to indicate that Claimant had a positive therapeutic response to treatment, the ALJ failed to properly evaluate Claimant's mental impairments under the legal standards imposed by the agency's rules and regulations. The Court cannot re-weigh the evidence and apply post-hoc rationale to substitute for the ALJ's failure to apply the correct legal standard. Thus, the ALJ's failure to fully and fairly consider Claimant's mental impairments cannot be viewed as harmless error.

Having carefully considered the decision of the ALJ and the evidence of record, the undersigned **FINDS** that the ALJ failed to employ the "special technique" required to

evaluate the mental impairments alleged by Claimant and that such error was not harmless; therefore, the decision of the Commissioner was not supported by substantial evidence and should be remanded for further proceedings. 20 C.F.R. §§ 404.1520a, 416.920a; *see also Adkins v. Astrue*, No. CIV.A. 3:09-01111, 2010 WL 5394975, at *13 (S.D.W. Va. Dec. 3, 2010), *report and recommendation adopted,* No. CIV.A. 3:090-1111, 2010 WL 5394987 (S.D.W. Va. Dec. 23, 2010).

## VIII.   Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 14, 2016

Cheryl A. Eifert
United States Magistrate Judge